MARSHALL K. FLOWERS, Plaintiff-Appellant,
v.
UNITED SERVICES AUTOMOBILE ASSOCIATION, Defendant-Appellee
No. 27057, No. 27128, No. 27229.
Intermediate Court of Appeals of Hawaii.
July 30, 2008.
Marshall K. Flowers, plaintiff-appellant, pro se.
Terrance M. Revere and Jason P. Healey (Motooka Yamamoto & Revere) for defendant-appellee.

MEMORANDUM OPINION
WATANABE, PRESIDING J., FUJISE, AND LEONARD, JJ.
Plaintiff-Appellant Marshall K. Flowers (Flowers) appeals pro se from the judgment entered on March 30, 2005 by the Circuit Court of the First Circuit (circuit court)[1] in favor of Defendant-Appellee United Services Automobile Association (USAA) and against Flowers on all claims asserted in Flowers's second amended complaint.[2] In his second amended complaint, Flowers sought damages, including punitive damages, for breach of contract, bad faith, and infliction of emotional distress stemming from USAA's alleged failure to fully and timely pay, in accordance with the renter's protection policy he had purchased from USAA, the replacement cost for: (1) household goods owned by Flowers and his wife, Anna, (collectively, Flowerses) that were lost or damaged sometime between their shipment from Hawaii on August 31, 1999 and delivery to the Flowerses' new residence in Australia on or about July 21, 2000 (Claim 1); and (2) a suitcase missing from the North Island Naval Air Station passenger terminal, San Diego, California, on August 31, 2000 (Claim 2).
On appeal, Flowers contends that the circuit court erred or abused its discretion by:
(1) granting USAA's motion for summary judgment on Flowers's breach-of-contract and bad-faith claims against USAA since there were genuine issues of material fact regarding whether USAA: (a) failed to pay Flowers the full replacement cost of missing items associated with the two claims; (b) "knowingly provided disingenuous information so as to pay original cost rather than replacement cost of the missing items"; and (c) misrepresented his policy by redefining policy requirements;
(2) granting the motion to withdraw filed by his attorney;
(3) responding to Flowers's motion to compel USAA to produce documents for inspection and copying by authorizing Ralph Rosenberg Court Reporters (Rosenberg) to accept and copy the parties' discovery documents;
(4) denying Flowers's motion to strike USAA's Exhibits "E" and "F," which were filed in opposition to Flowers's motion to file a second amended complaint;
(5) denying Flowers's motion for reconsideration and motion to alter or amend the judgment because Flowers presented new information therein that he could not have presented during adjudication of this case; and
(6) awarding USAA attorney's fees and costs because the circuit court was without jurisdiction to do so after Flowers filed his notice of appeal.
We agree that the circuit court should not have granted summary judgment in favor of USAA. Accordingly, we: (1) vacate (a) the order granting USAA's motion for summary judgment, (b) the judgment entered in favor of USAA and against Flowers pursuant to the order granting summary judgment, and (c) the order awarding USAA attorney's fees and costs; and (2) remand this case for further proceedings consistent with this opinion.

I. BACKGROUND
A. The Renter's Protection Policy
Prior to his retirement from the military, Flowers purchased a renter's protection policy from USAA, initially for the period from August 26, 1999 to August 26, 2000 (Policy 1), and upon renewal, for the period from August 26, 2000 to August 26, 2001 (Policy 2). Both policies applied "only to loss which occurs during the policy period."
Policy 1 included the following relevant terms:
DEFINITIONS
. . . .
1. "actual cash value" means the replacement cost of the property at the time of loss less a deduction for depreciation based on its age and usage.
. . . .
THE FOLLOWING ARE ADDITIONAL COVERAGES MOVING AND STORAGE
. . . .
A. MOVING AND STORAGE begins when your property passes into the custody of a public carrier, including . . . a storage facility. It must be under a bill of lading, a mover's contract, baggage check, or other form of shipping or storage document.
It ends when your property is delivered to your permanent or temporary address in accordance with the shipping document. Or when you take possession of your property from storage.
B. In addition to the previously described CAUSES OF LOSS COVERED there is coverage under MOVING AND STORAGE for:
1. loss of your property if, when described under a bill of lading, mover's contract, baggage check, or other form of shipping or storage document, it cannot be located after a reasonable search.
. . . .
C. We [USA] will not cover loss or damage caused by
1. Breakage, marring, scratching or handling.
2. Delay during shipment.
. . . .
5. Inherent defect of the property.
6. Insufficient packing or address.
. . . .
PERSONAL PROPERTY CONDITIONS
. . . .
If there is an accident or incident that may be covered by this policy you must do the following:
DUTIES AFTER LOSS
1. In the case of a loss by theft, . . . or malicious mischief, immediately notify the police or military authority, whichever has jurisdiction over the location where the loss occurred . . .
. . . .
3. Contact us as soon as possible and tell us as much as you can about the loss. Give us the price and date of purchase, actual cash value and a complete description of the article(s) involved.
4. Submit a proof of loss when required by us.
5. Send us receipts, appraisals or other proof of ownership or value. . . . You must tell us if there is other insurance on the property.
6. If required by us, you must show us the property and answer our questions under oath about the loss or damage.
7. You must tell us about the loss within 91 days after the loss is discovered. Unless you are reasonably prevented from doing this, your claims will not be accepted.
. . . .
LOSS SETTLEMENT
We will pay the full cost of repair or replacement, subject to all policy provisions. No deduction will be made for depreciation.
The value of the covered property is not agreed upon, but shall be set at the time of loss or damage.
1. It is our option to:
a. replace, or pay you our cost to replace the property with new property of like kind and quality, without deduction for depreciation; or
b. pay you the cost to repair or restore the property to the condition it was in just before the loss.
. . . .
3. We will not pay more than the limit of liability shown on the Declarations Page for PERSONAL PROPERTY. Nor more than any other limits stated in the policy.
4. When the cost to repair or replace an item is more than $500, no more than actual cash value will be paid until repair or replacement is completed.
You may make a claim for loss on an actual cash value basis and then make claim within 180 days after the loss for any additional liability.
5. We will adjust all losses with you. . . . Loss will be payable 60 days after we receive your proof of a loss and:
a. we reach an agreement with you; or
b. there is an entry of a final judgment; or
c. there is a filing of an appraisal award with us.
. . . .
OTHER INSURANCE
1. If, at the time of loss:
a. there is trip transit coverage in force, . . . then this policy will apply only when that coverage has been exhausted.
2. If there is insurance other than described above, payment under this policy will be prorated on the basis of the total amount of insurance applying to the loss.
(Original format altered; underscoring and italics added.) Policy 1 further stated: "No waiver or change to the coverages stated in this policy may be made except by us, in writing."
In June 1999, USAA apparently issued an endorsement (June 1999 endorsement) that was intended to replace the language of item 4 of the loss-settlement section of the standard renter's protection policy, underscored in Policy 1 above, with the following:
4. We will pay no more that [sic] actual cash value until repair or replacement is completed unless replacement [sic] unless [sic] the entire loss is less than $500.
(Emphasis added.) However, the June 1999 endorsement was not attached to Policy 1 when it was issued to Flowers in August 1999.
When Flowers renewed his policy, Policy 2 incorporated an "Amendatory Endorsement  Hawaii" (Policy 2 endorsement) that made several changes to the coverage terms included in Policy 1. The Policy 2 Endorsement deleted items 1 and 4 of the loss-settlement section of Policy 1 and replaced the items with the following:
1. It is our option to:
a. replace or pay you our cost to replace the property with new property of like kind and quality, without deduction for depreciation, or
b. pay you the cost to repair or restore the property to the condition it was in just before the loss, or
c. pay you the necessary amount actually spent to repair or replace the damaged property.
. . . .
4. We will pay no more than actual cash value until repair or replacement of the damaged property is completed unless the entire loss is less than $500. You may make a claim for loss on an actual cash value basis. Repair or replacement must be completed within 365 days after loss unless you request in writing that this time limit be extended for an additional 180 days. Upon completion of repairs or replacement, we will pay the additional amount claimed under replacement cost coverage.
The Policy 2 endorsement also added a liability exclusion for "punitive or exemplary damages, fines or penalties." In a "Policyholder Notice of Coverage Changes" that was sent to Flowers with Policy 2, USAA summarized the changes that had been made to Policy 1 by stating, in relevant part, as follows:
Personal Property Conditions
Loss Settlement
Added a clause to clarify that only the amount actually paid to repair or replace the damaged property is the amount owed under the contract. .
The replacement cost requirement was changed from a per item basis to a per loss basis. Previously, this provision required replacement of any item over $500 before replacement cost would be paid. It now requires that items must be replaced on any loss over $500 before replacement cost will be paid. Also, [sic] sets a time limit of 365 days for repair or replacement. This time period may be extended an additional 180 days upon written request from the insured. Once the repair or replacement is complete, payment for the additional amount claimed under replacement cost coverage may be made. . . .
(Original formatting altered; emphases added.)
B. The Claims Made to USAA
Flowers made four claims to USAA for losses incurred during the effective dates of Policy 1 and Policy 2. He settled two claims, one related to the theft of his car, which he reported on December 13, 1999, and the other related to luggage that was lost on a May 27, 2000 flight on Delta Airlines.
The two other claims (Claim 1 and Claim 2) that were made, respectively, under Policy 1 and Policy 2 are the subject of this appeal.
1. Claim 1Losses Incurred on or About July 21, 2000
Claim 1 arose out of the shipment of the Flowerses' household goods from Hawai`i to Australia on or about August 31, 1999. The items shipped were listed on a document prepared for American Movers, Inc., the shipper. On the document, Flowers certified that the listed items were tendered to the "origin agent[,]" and the members of "[t]he origin agent chief crew certifie[d] that the items listed . . . were received and placed in the external shipping container(s) noted[.]" The items arrived in Australia on December 3, 1999 and were initially placed in storage. A partial delivery of "high risk items" was made to the Flowerses' residence on February 29, 2000, and Anna determined that two boxes were missing. Anna thereafter submitted to USAA a Joint Statement of Loss or Damage at Delivery, dated May 30, 2000, listing as missing a Panasonic printer and Pioneer DVD player, and listing as "not working" a "Panasonic 32" TV," a "Panasonic 19" TV," and a "Sanyo 28" TV."
After receiving the final boxes from storage on July 20 and 21, 2000, Flowers noticed that other items were missing or damaged. He filled out and submitted to USAA Joint Statement of Loss or Damage at Delivery and Notice of Loss or Damage forms for these items. As instructed by a USAA representative, Flowers then filled out a Transportation Loss Report form (loss report form), which required Flowers to list each item of personal property for which a claim was being made and indicate for each item: the "type of damage"; the inventory number; the weight of the item or carton; the owner of the item; the date and place the item was purchased, or, if the item was a gift, the date received; the repair estimate with the estimate attached; the original cost of the item with attached receipts; and the replacement cost. In the multiple loss report forms Flowers submitted to USAA, Flowers was unable to state the date of purchase or receipt and the original cost of every item listed as "missing." In a cover letter to Tracy Hunter of the USAA office in San Antonio, Texas, also dated October 11, 2000, Flowers stated that he was enclosing the documents requested by USAA but that it was "impossible" for him to establish exactly what was missing without adequate time, since the items packed in boxes were not individually annotated.
By a letter dated October 31, 2000, USAA rejected one of Flowers's loss report forms as defective because:
1. Original purchase receipts, cancelled checks, charge card receipts, appraisal's [sic], photographs or other proof of ownership was not provided.
. . . .
The Itemized Statement of Loss was not completed, signed, and dated. Please list each item of personal property that a claim is being filed for providing all the information as requested on the form.
The letter also outlined Flowers's duties under Policy 1, including the duty to "[s]end [USAA] receipts, appraisals or other proof of ownership or value." Additionally, the letter advised Flowers that "[w]hen the cost to repair or replace an item is more than $500 no more than actual cash value will be apid [sic] until repair or replacement is completed." (Formatting altered).
Thereafter and throughout 2001, USAA and Flowers exchanged a volley of letters. USAA sent Flowers numerous letters informing him that his claims had been rejected due to insufficient documentation or because they were for property damage, which USAA stated was not covered under Policy 1 and should be presented instead to "the carrier and/or proper military claims office for consideration." On April 16, 2001, based on information provided by Flowers, USAA sent Flowers a check for $964.76 in settlement of Claim 1. The amount of the check was based on a total replacement cost of $2,547.09 less depreciation of $1,332.32 and the $250.00 deductible. However, Flowers refused to cash the check because USAA had deducted an amount for depreciation, which Flowers objected to because he maintained he was entitled to full replacement value under Policy 1.
By a letter to Flowers, dated December 5, 2001, Douglas D. Dunkly (Dunkly), the claims service director for USAA's Western Regional Office, reiterated USAA's position regarding Claim 1:
We have previously advised you of the documentation necessary to process your claims in our prior correspondence and responses to you. I appreciate the opportunity to reiterate the status of each of your claims.
. . . .
Date of loss July 21, 2000: The claim was concluded on April 16, 2001 when payment was issued for the items for which sufficient documentation had been received, less the deductible and recoverable holdback. As you have been advised in our letter dated April 16, 2001, you must submit a legible copy of the receipts documenting that the items have been replaced in order to recover the holdback amount. As you were also advised in the same letter, the final date to submit this information is December 24, 2002.
On January 2, 2002, Flowers filed a complaint against USAA with the State of Hawai`i Department of Commerce and Consumer Affairs, Insurance Division (DCCA).[3] Flowers requested that DCCA investigate "the unfulfilled obligation, deceitful tactics and barriers employed by [USAA] as justification to deny and delay payments for legitimate claims submitted by [Flowers] pursuant to [Flowers's] Renter's Policy purchased with this company."
In a January 9, 2002 letter to Flowers that was signed by Dunkly, USAA enclosed: a check for $1,332.32, "which reflects the depreciation applied to [Flowers's] `moving and storage' claim of July 2000"; copies of Flowers's submitted loss report forms; and a copy of Flowers's "USAA Renter's Policy Packet, effective August 26, 2000 to August 26, 2001." In the letter, Dunkly stated:
I have "yellow tabbed" a portion of that policy entitled, "Policyholder Notice of Coverage Changes".
Please note your Policy's Endorsement, # 32957 (HI) is dated June 1999. Under the subsection titled "Personal Property Conditions, Loss Settlement" it states as follows:
"It (the Policy) now requires that items must be replaced on any loss over $500.00 before replacement cost will be paid."
In an effort of utmost good faith, [we are] willing to pay you the depreciated amount at this time for the July 2000 claim only. Please understand that our position on all of your other claims remains unchanged. .
All rights and defenses available to USAA remain reserved. This communication, nor any previous correspondence, has not intended to waive or amend any Terms, Conditions, Limitations or Exclusions of your USAA Renter's Policy.
Flowers negotiated this check.
In a letter to DCCA investigator Michael Chan-Hin (Chan-Hin) dated February 20, 2002, USAA described the status of Flowers's claims with USAA. The letter noted, as to Claim 1:
Date of loss July 21, 2000: The claim was concluded on April 16, 2001 when payment was issued for the items for which sufficient documentation had been received, less the deductible and recoverable holdback. Upon further review, it was noted that the policy Mr. Flowers had received for this policy period did not include the language about the initial settlement being for the actual cash value. Therefore, a check in the amount of $1332.32 was issued for the recoverable holdback on January 7, 2002. On February 15, a supplemental listing of missing items was received from Mr. Flowers. As Mr. Flowers indicated he had never received the initial settlement check, a stop-pay was requested on the first check. This amount will be included with the supplemental payment. The supplemental items will be settled at replacement cost with no holdback.
(Emphasis added.)
In another letter to DCCA, dated March 8, 2002, USAA again acknowledged that the June 1999 endorsement revising the Loss Settlement terms of the policy was not attached when Policy 1 was issued to Flowers in August 1999. The letter explained that when this information was brought to USAA's attention, "a check for the depreciated amount, $1,332.32 was issued to Mr. Flowers on January 7, 2002." The letter continued:
Mr. Flowers submitted additional information to us along with a letter dated January 1, 2002. After review of this additional information, a check in the amount of $4,062.90 was issued to Mr. Flowers on February 18, 2002. This included the amount of the check issued April 16, 2001 for $964.76. A stop pay was completed for the original check.
The settlement amount was determined based on the replacement cost of $5,829.22 less the check of January 7, 2002 for $1,332.32, $184.00 the amount originally allowed for china Mr. Flowers advised us had been located and the $250 deductible. This settlement was determined based on the Transportation Loss Itemization Form submitted to USAA by Mr. Flowers. Items where there was no cost provided by Mr. Flowers, were not included in the settlement.
The letter also discussed the status of Flowers's claim for the replacement cost of a DVD player Flowers claimed was missing:
As there was no model number provided, USAA Claims Replacement Service was requested to provide an estimate for a "like, kind, quality" DVD player based on the date of purchase and original price paid. Based on the limited information that was provided it was determined the appropriate replacement cost would be $251.68. The original Itemized Statement of Loss listed Panosonic [sic] DVD player, please see attached. After settlement was made based on this information, Mr.. Flowers has presented information for a Pioneer DVD player. To date no proof of ownership to substantiate the model number has been presented to determine if an adjustment should be made in the originally [sic] amount allowed.
In an April 18, 2002 letter to DCCA, USAA provided an update on Flowers's claim for the missing DVD player:
The DD Form 1840 submitted to the military listed a Pioneer DVD as missing. On the paperwork originally submitted by Mr. Flowers, he listed a Panasonic DVD purchased in 1997. Based on this information, USAA Claims Replacement Service provided the replacement cost for a basic "Like, Kind, Quality" replacement for a Panasonic DVD. In subsequent correspondence from Mr. Flowers, he disputed the settlement and advised the missing equipment was a Pioneer DVD/LD 700. The settlement has been adjusted to a $717.60 for a "Like, Kind, Quality" Pioneer DVD.
There was no allowance for any item with missing parts as this would be classified as damage and is so noted.
As this property was delivered to Mr. Flower's [sic] home in Australia, sales tax was not included in the settlement.

Total: $7,932.09
Less Deductible: -$ 250.00
Less 1/7/2002 Check: -$1,332.32
Less 2/18/2002 Check: -$4,062.90
Less China Allowance: -$ 184.00 (china found)
Less Allowance for Panasonic DVD -$ 251.68
Supplemental Settlement Check: $1,851.19

In a letter dated May 3, 2002, Flowers told USAA that certain matters must be resolved before a release of Claim 1 can be negotiated. Flowers enumerated two issues:
1. Poineer [sic] DVD DVL 700 Cost $950 (Item was brand new and unused) Claimant contacted the company and the item is no longer available. The navy exchange has a similar item almost the exact item that plays Laser disc Cost $1049) [sic] This information was provided USAA[.]
Concern: Similar item cannot be purchased in Australia or prices in Australia for television, videos, computers, DVDs, far exceed U.S. prices. Who will pay for shipping, customs and taxes? USAA or the U.S. government. [sic]
2. Weight Bench #207 is missing but as stated the front was damaged. Nonetheless, the bench was not delivered. Replace [sic] cost in Australian dollars $379.00
Prices provided for missing items were purchased cost [sic] in U.S. If and when items are purchased in the U.S. who will pay shipping and custom cost? USAA or U.S. Army.
Although the property was shipped to Australia, your insurance company paid a claim based on U.S.A. prices. However, no taxes were allowed and replacement items must get to Australia. Custom rates applies [sic] for items owned less than one year.
Please provide a settlement check to cover items as noted or information regarding your disagreement and answers to questions noted. In addition, I will accept USAA purchase and (new) replacement of item lost for the same item and/or confirm where such item can be purchased in Hawaii for the CRS Quote.
(Emphasis added.)
On July 2, 2002, in a further effort to settle the remaining claims, Flowers met with Gary Rindo (Rindo). of Crawford and Company, an adjuster retained as USAA's local agent. Flowers summarized the settlement discussions in a July 3, 2002 letter to Rindo. With respect to Claim 1, Flowers specifically referenced the value of the DVD player and weight bench as still at issue:
DVD 700
 USAA offers as similar comparison the DVL -919 Player priced at $719.00
 DVL purchased and shipped to U.S.A. address by USAA
 USAA claims no statutory regulation [sic] exist to ship to Australia
Issue:
 DVD 700 is no longer available
 Insured presented Mr. Rindo with a printout showing the DVL919 and the DVD 700 are from the same manufactory [sic] and both look alike
 Pioneer DVL 919 DVD Player Key Features
 USAA has offered to replace a look alike item thus excluding quality and performance.
 DVD 700 cost $940.00 excluding tax
 DVL 919 cot [sic] $717.60 that excludes shipping and custom cost to Australia
 Insurer [sic] will settle for purchased cost
Weight Bench
 Weight Bench missing
 Replacement cost in Australia was in the neighborhood of $A379-389
 USAA was informed the weight bench is missing though the leg press was off prior to shipping.
Replacement Cost
 USAA was provided with actual cost incurred in the United States
 USAA provided replacement cost to purchase in the United States
 USAA has not agreed to shipping and custom cost
Issue
 Items claimed were lost in shipment to Australia and replacement cost must be cost incurred in Australia to purchase similar items.
 If necessary and required by USAA insured will provide USAA with replacement cost of similar items purchased in Australia
 Insurer had offered to accept $1500.00 for shipment and custom cost to Australia and/or additional cost insured for purchasing in Australia.
 Insured will sign a release upon USAA agreement to pay for the items noted at issue.
(Emphasis added.)
On July 9, 2002, Flowers had a teleconference with Rindo and other USAA representatives to further discuss settlement. According to Flowers, the Claim 1 items that were discussed were the DVD player and weight bench. Flowers also mentioned that USAA "alluded that they believe [he] had not fully complied with duties after loss as required by the policy. Specifically, [USAA] had stated that documentation of proof of ownership and documentation as to value were not submitted and they were reserving their rights under the policy terms and conditions." Efforts to settle at the July 9, 2002 teleconference failed.[4]
On July 13, 2002, Flowers sent USAA a letter enclosing documents that provided information on the replacement cost, in Australian and United States dollars, for the Claim 1 items. On behalf of USAA, Rindo responded on July 16, 2002 by sending Flowers a check in the amount of $1,851.19 to pay "for the undisputed amount owed on the loss of July 21, 2000." Although a check for the same amount had earlier been sent to DCCA, to be released to Flowers upon his written release on Claim 1, Rindo explained to Flowers that "[i]t will not be necessary for you to sign any release or proof of loss before negotiating these drafts." (Emphasis added.)
On July 16, 2002, with the statute of limitations for filing a lawsuit about to run, Flowers filed the underlying complaint in the circuit court.
In a letter dated September 7, 2002 to Sue Griffin of USAA's Sacramento office, Flowers stated:
I am in receipt of your letter referencing a settlement check for the household goods missing from shipment delivered on July 20-21, 2000. I have no recollection of receiving a check from your office. After, [sic] the civil suit was filed, Mr. Rindo mailed a letter with a check enclosed to my postbox. In the letter he stated words to the effect that you asked that his company no longer conduct any other action on this matter and any further discussions would be directed to the Sacramento office. A copy of the letter and returned check were sent to the San Antonio Office. The check was copied and returned for future references. If you desire a copy of this check, please inform me and a copy can be sent to you.
Since this matter is presently before the court, will consider my options regarding the services of an attorney. . . .
Please provide a settlement check to cover items as noted in my July 13, 2002 correspondence to include tax. You may reissue any check that will contribute to the integrity of this matter.
On October 2, 2002, Flowers filed his First Amended Complaint.
On October 30, 2002, Flowers sent a letter to USAA's president, expressing a desire to bring "a good faith closure" to Claims 1 and 2. Flowers enclosed information regarding the claims and stated, with respect to Claim 1, in part as follows:
[E]nclosed are checks returned after sending to your office in San Antonio. Mr. Rindo of Crawford and Co. mailed the two enclosed checks [for $1,815.19 and $623.00[5]] after the civil suit was filed in the First Circuit Court and served on him on the same date.
Flowers also stated:
Presently, this civil action is in the First Circuit Court State of Hawaii and awaits pre-trial activities. In the interest of bringing this litigation to an end, I am making this last ditch effort to resolve this matter pursuant to my policy. . . . I can and will allow five days after receipt of this letter for your response. I trust that an amicable solution will bring this matter to a close to prevent a waste of judicial economy and your corporate time.
(Paragraph formatting altered; footnote added.)
In a September-26, 2003 letter to USAA's counsel, Flowers stated that "[t]he total amount of claims excluding tax, interest, shipping, and custom cost is $7458.66." Flowers also stated, with respect to Claim 1:
The lost culinary dishes and other items cannot be acquired in Australia. Therefore is it [sic] necessary that the items are repurchased here in the United States and shipped to Australia. I would prefer having USAA purchase the items and ship to Australia or an agreement that the items are purchased by me and USAA incur cost for shipping and customs. As you are aware custom cost is attributed to items brought into Australia.
Additionally, tax and interest must be included on the entire dollar amounts claimed to include court cost and $1500.00 in attorney fees.
Attached to the letter was a summary of the amounts that Flowers claimed remained unpaid for Claim 1 and Claim 2. According to the summary, the total replacement cost for the Claim 1 missing household goods, excluding tax, was $10,428.86. Of this amount, Flowers acknowledged having received and cashed checks for $4,062.90, $1,332.32, and $252.96[6] (a total, according to Flowers, of $5,468.18),[7] but claimed that USAA still owed him $4,960.68, plus interest, tax, and attorney's fees for Claim 1.
2. Claim 2Losses Incurred on or About August 30, 2000
Sometime before September 26, 2000, Flowers submitted Claim 2 to USAA, seeking insurance proceeds for a suitcase that he alleged was missing when he arrived on August 30, 2000 at the passenger terminal of the North Island Naval Station in San Diego, California, en route to Charleston, South Carolina. According to a report of the incident prepared by a military patrolman, Flowers alleged that the missing suitcase contained the following items: clothes; one pair of shoes; one cordless telephone; a brown leather bank bag containing United States savings bonds totaling over $20,000.00; travel vouchers issued by Delta Air Lines (Delta) for amounts of $250.00, $300.00, and $400.00; three AT&T phone cards; and a United States passport.
In a September 27, 2000 letter, USAA acknowledged Flowers's claim and reminded Flowers of his obligations under Policy 2 to "cooperate in the investigation and documentation of [his] loss." The letter also instructed Flowers, in part:
To help us process your theft loss, please submit the following:
1. The police report case number.
2. Any documentation you may have to support your loss such as the original purchase receipts, cancelled checks, charge card receipts, appraisal's [sic], owner's manuals provided by the manufacturer, or photographs. Also, provide a complete description of each claimed item to include the manufacturer, model number, age, and replacement cost.
The following applies to your claim:
1. We may check into replacement of some items through our claims replacement service.
2. You carry replacement cost coverage under your Renters Policy. For losses valued at $500 or more, you will be reimbursed the Actual Cash Value (ACV) until you submit the original replacement receipts.
3. $250 deductible.
4. The $200 policy limit of liability for money, bank notes, bullion, other than goldware, silver other than silverware, platinum, coins and medals will apply.
5. The $1000 policy limit of liability for . . . evidences of debt, . . . passports, airline or other transportation tickets[.]
Please provide the necessary information and documentation within 60 days from the date of this letter.
In a letter to Flowers dated October 31, 2000, USAA rejected Claim 2 as defective in that:
1. Original purchase receipts, cancelled checks, charge card receipts, appraisal's [sic], photographs or other proof of ownership was [sic] not provided.
2. You answered "Yes" to question #18; "Do you have other insurance?", The name, address, and phone number of the company were not provided. Please provide this information.
The Itemized Statement of Loss was not completed, signed, and dated. Please list each item of personal property that a claim is being filed for providing all the information as requested on the form.
USAA also informed Flowers that under Policy 2,

[w]hen the cost to repair or replace an item is more than $500[,] no more than actual cash value will be apid [sic] until repair or replacement is completed. You may make a claim for loss on an actual cash value basis and then make a claim within 2 years after the loss for any additional liability.
(Formatting adjusted; emphasis in original.)
In a November 10, 2000 letter to USAA, Flowers explained that "[p]resently, [he did] not have receipts or proof of ownership" for the Claim 2 lost items; he could only show that "the items upon check[-]in weighed approximately 43 lbs." Additionally, Flowers stated that "[a]ll documentation for the U.S. Saving [sic] Bonds and Airline vouchers are [sic] in baggage and documentation transported to Australia. It is therefore impractical at this time due to the many boxes and files that must be searched." Flowers also stated that he would send a letter to Delta, requesting assistance in his search for the travel vouchers, and that Delta had replaced the $250.00 voucher but not the two other vouchers. Flowers also informed USAA that the Claim 2 items were not covered by any other insurance policy.
Pursuant to letters dated January 16, 2001, December 5, 2001, and January 9, 2002, USAA again reminded Flowers that he had failed to provide the documentation requested to process Claim 2 and accordingly, had not complied with the conditions of Policy 2.
The complaint Flowers filed with DCCA on January 2, 2002 included allegations regarding Claim 2. In a letter to Chan-Hin dated February 20, 2002, USAA described the status of Flowers's claims with USAA. The letter noted, as to Claim 2:
Date of loss August 30, 2000: The documentation provided by Mr. Flowers was not sufficient to evaluate the nature and extent of his loss; therefore, the claim was denied. Mr. Flowers may provide additional documentation until the expiration of the two-year time limit of the Renters Policy. Though Mr. Flowers did submit a Loss Report form, no supporting documentation was included. Mr. Flowers was advised in writing that the final date to submit necessary documentation is December 15, 2002.
By a letter dated April 15, 2002, USAA informed Flowers that it was adjusting Claim 2 and that Chan-Hin will be holding a settlement check, which would be presented to Flowers in exchange for Flowers's release on Claim 2. USAA also informed Flowers that it would not apply depreciation in calculating the payment amount of the settlement check.
In an April 18, 2002 letter to Chan-Hin, USAA enclosed a settlement check for Flowers in the amount of $623.60 for Claim 2. The settlement check amount was based on a total replacement cost of $873.60 ($60.00 for replacement of a passport and $813.60 for replacement of an airline ticket), less the Policy 2 deductible amount of $250.00. USAA explained that this settlement did not include an amount for the Delta travel vouchers and instructed Chan-Hin to give Flowers the check in exchange for Flowers's signed release on Claim 2.
Following the July 2, 2002 meeting between Flowers and Rindo, Flowers wrote the July 3, 2002 letter to Rindo in which Flowers claimed his missing suitcase contained over $21,000.00 in United States savings bonds, which had not been replaced by the United States government.[8] Flowers expressed a belief that USAA had knowledge of the missing baggage but did not conduct an investigation or interview anyone to assess the validity of his claim. Flowers also stated: "USAA has in the past concealed information favorable to the insured settlement in a similar court case," "Delta airline personnel were instructed by someone not to provide information favorable to settlement[,]" and "other external forces are involved in undermining this claim."[9]
In a letter to USAA dated October 30, 2002, Flowers enclosed a spreadsheet that summarized his Claim 2 losses. The spreadsheet described the items[10] that were in Flowers's missing suitcase, as well as the original price and the replacement cost in the United States for each of the items. According to this spreadsheet, the total amount of Flowers's claim, excluding taxes, was $2,467.89. The total amount unpaid on Claim 2 (after subtracting $161.19, the amount Flowers had received from USAA for Claim 2) was $2,306.70.
In a letter dated September 26, 2003, Flowers maintained that USAA still owed him $2,336.67 for Claim 2. He alleged that the total replacement cost for items related to Claim 2 was $2,199.57, excluding tax; plus $298.32 for "Limitation USAA pay on U.S. Saving Bonds [sic], Airline Ticket ($1000.00) [and] Difference from Airline vouchers ($701.68);" less $161.19 for a check Flowers previously received and cashed. This letter also indicated that Flowers returned to USAA the expired settlement check for $623.60, which had been offered through DCCA.
C. Flowers's Attorney's Motion to Withdraw
On March 25, 2003, Flowers's attorney filed a motion to withdraw. He stated that (1) Flowers had disrupted his schedule and meetings with other clients many times by "dropping in" without an appointment; (2) his and Flowers's personalities were prohibitively ill-suited to each other; and (3) Flowers appeared unwilling to compromise with USAA, making settlement with USAA difficult.
On April 1, 2003, Flowers filed an objection to his attorney's motion to withdraw. Flowers stated, among other things, that his attorney (1) had failed to return Flowers's telephone calls, (2) did not send a pleading document to Flowers, and (3) filed pleadings under the wrong civil number. Flowers argued that his attorney's allegations were "groundless, unfair, and based upon unfounded information," and that his attorney's withdrawal would materially affect Flowers by prolonging litigation, depriving him of adequate legal counsel, and creating additional expense and unnecessary anxiety for him.
On May 27, 2003, the circuit court granted Flowers's attorney's motion to withdraw. Subsequently, Flowers filed all relevant pleadings and appeared at relevant hearings pro se.
D. Motion to Strike Exhibits
On November 4, 2003, Flowers filed a motion for leave of court to file a second amended complaint. On December 3, 2003, USAA filed a memorandum in opposition to the motion, to which was attached Exhibits "E" and "F," which USAA claimed demonstrated Flowers's undue delay, bad faith, or dilatory motive in seeking to file the second amended complaint.
Exhibit "E" was a copy of a "Memorandum in Reply to [the Flowerses'] Opposition to Federal Defendants' Motion to Dismiss[,]" signed by an assistant United States attorney and filed in the United States District Court for the District of Hawaii (U.S.D.C.) in two consolidated civil cases. The memorandum related that in lieu of being court-martialed on multiple charges of larceny of electronic and household goods from local military exchanges, Flowers worked out a plea bargain to receive non-judicial punishment and retire from the military forthwith.
Exhibit "F" included copies of complaints that Flowers had filed against the Fort Jackson Federal Credit Union, First Hawaiian Bank, and the United States Army 25th Infantry Division in the U.S.D.C., seeking punitive damages for, inter alia, emotional suffering allegedly caused by these financial institutions when they turned over the Flowerses' financial records to military investigators.
On December 16, 2003, Flowers filed the motion to strike exhibits. He argued that Exhibits "E" and "F" were "irrelevant, impermissible hearsay, prejudicial, an unauthenticated intent on undermining [Flowers's] claim and planting a seed of prejudices [sic] in the mine [sic] of this Court."
On January 2, 2004, the circuit court entered an order granting Flowers's motion for leave to file a second amended complaint.
On January 22, 2004, the circuit court held a hearing on the motion to strike exhibits. Flowers objected to the admission of Exhibits "E" and "F" into evidence, pursuant to Hawai`i Rules of Civil Procedure[11] Rule 404, on grounds that they constituted irrelevant character evidence. In denying Flowers's motion to strike exhibits, the court stated `Thirst, it's untimely. And, second, I think all matters bearing on credibility are relevant and so that's denied." On February 10, 2004, the circuit court filed an order denying Flowers's motion to strike exhibits.
E. Motion to Compel Production of Documents
On December 12, 2003, Flowers filed a motion to compel USAA to produce documents for inspection and copying. Flowers and USAA's counsel had earlier met to exchange and inspect documents in response to a document discovery request by Flowers. In his motion to compel production of documents, Flowers argued that during the meeting, Billbery selected and copied documents without Flowers's input, even though Billbery had agreed to allow Flowers to inspect and select the documents to be copied. Flowers alleged that when he took the documents from USAA's counsel, USAA's counsel threatened and shouted at him. Flowers added that USAA's counsel failed to provide all of the documents Flowers had requested. Flowers asked that all further discovery be conducted under the circuit court's supervision.
On February 3, 2004, following a hearing on January 22, 2004, the circuit court entered an order granting the motion to compel. The court also ordered the parties to deliver any documents produced for copying in the future to Rosenberg, the designated court reporter, and ordered USAA to produce the investigative documents related to Flowers's claim.
F. Motion for Summary Judgment
Flowers's Second Amended Complaint against USAA, filed on January 2, 2004, included the following counts: Breach of Contract (Counts I and II), Bad Faith to Settle (Count III), Emotional Distress (Count IV), and Punitive Damages (Count V). Flowers also requested that the circuit court award him consequential damages.
On February 12, 2004, USAA deposed Flowers, and the following line of questioning ensued:
Q. . . . .
Okay. Your Second Amended Complaint, in Paragraph 13, you allege, when [you] insisted on replacement costs, [USAA] employed and used the technique of lowering the value on specific items to depreciate the replacement cost to actual value.
. . . .
Q. What is the basis for that allegation?
A. The basis of that allegation is a conference we had July 2002; and [USAA representatives] Mr. Dunkly and Ms. Sue Griffin in that conference, every time that we  every time a matter would come up, they would lower the price on one item, and then they would bring the price up. So I have information where  like, for the weight bench, they said that the weight bench was damaged, but the weight bench was  but the weight bench was missing; so, therefore, they tried to divert, I guess, settlement or agreement from one thing to the other. Like, they indicated  for your airline tickets, they indicated, Okay, we'll give you so much for this, and then they would deduct money from one particular item. So they kept shifting it around from one thing to the other.
. . . .
Q.. . . .
Mr. Flowers, let me ask you, did you ever replace any of the items that were missing  that came up missing, that you were reimbursed for from  by USAA?
. . . .
A. I don't know. My wife would  in Australia. don't know. Anything I  let me just say one thing. Clothes I've replaced since I've been here; I had to buy. As for furniture and all of that stuff, I don't know. My wife is in Australia. So I would try not to replace anything until I'm in Australia. Unless she replaced something in Australia. . . . And I think maybe she bought a weight bench. Not really sure.
. . . .
Q Okay. Did you ever provide USAA with a copy of any of these receipts?
A They never asked. They never requested.
Q. Okay. So in fact, then, . . . my original question was: Have you replaced any of the items that were missing? The answer is, no, you haven't?
A. No. That's correct.
Q. Okay. And you haven't, in fact, replaced any of those items?
A. I don't know. My wife would have  I'd have to get the information from 
Q. Okay.
A. She has bought the kids clothes and books and things like that, some of those things that she bought.
. . . .
Q. You have not, then, in fact, replaced any of the items that came up missing in Australia; is that correct?
A. I have not. I can only answer for myself.
Q. Okay.
A. I have not replaced any of the items  well, yes, I did. I 
Q. And what?
A. A video and  no, this is damaged stuff. This is damaged. Sorry.
I can't recall. I'd have to look at my receipts.
Q. Okay. Did you ever provide USAA with any receipts for items that you may have replaced?
A. No. They never requested them.
(Bolded emphasis in original removed; underscoring added.)
On February 27, 2004, USAA filed its motion for summary judgment. USAA argued that based on the documentary evidence in the case and Flowers's own admissions, USAA did not breach any contractual obligation owed to Flowers and Flowers suffered no actual or consequential damages as a result of any conduct by USAA.
At a March 19, 2004 hearing on the motion for summary judgment, the court orally granted the motion and explained:
It appears that [Flowers] failed to satisfy or comply with the conditions of the policy, and that's verified in [Flowers's] affidavit, Paragraph 30. [[12]] Nonetheless USAA made payments to [Flowers]; thus his breach of contract claims fail.
There's also a real question as to USAA's liability to [Flowers] in the first instance, and therefore there's no bad faith claim. Further, USAA has a reasonably arguable basis for denying [Flowers's] claim, so again there would be no basis for bad faith.
And in terms of emotional distress and punitive damages, breach of contract does not give rise to an emotional distress claim in most circumstances. That's Francis versus Lee Enterprises[, 89 Hawai`i 234, 971 P.2d 707 (1999)]. And there's also nothing coming near clear and convincing proof for the basis of punitive damages.
(Emphases and footnote added.) On April 12, 2004, the circuit court filed an order granting the motion for summary judgment.
G. Motions for Reconsideration and to Alter or Amend the Judgment
On April 22, 2004, Flowers filed the motions for reconsideration and to alter or amend the judgment. Flowers alleged that he had recently discovered that he should have requested actual, rather than consequential, damages in his Second Amended Complaint. Flowers requested leave to amend the Second Amended Complaint accordingly. Flowers also argued that new evidence had arisen since adjudication of the case: (1) an affidavit by an acquaintance of Flowers, Napoleon Annan-Yartey (Annan-Yartey), regarding the teleconference involving Flowers, representatives from USAA and Crawford and Company, and Chan-Hin on or about July 9, 2002, which Annan-Yartey witnessed and audiotaped; and (2) the audiotape of the teleconference.
On July 2, 2004, the circuit court filed an order denying the motions for reconsideration and to alter or amend the judgment.
H. Motion for Attorney's Fees and Costs
On July 2, 2004, USAA filed its motion for attorney's fees and costs.
On July 8, 2004, Flowers appealed the circuit court's order granting motion for summary judgment.
On July 13, 2004, Flowers filed a memorandum in opposition to USAA's motion for attorney's fees and costs. Flowers argued that USAA was not entitled to attorney's fees or costs under the assumpsit statute or any other statute because (1) his claims were not frivolous; (2) USAA "did not receive judgment" and the motion for attorney's fees and costs was untimely since several months had passed since the entry of the order granting USAA's motion for summary judgment, and (3) the circuit court was divested of jurisdiction when Flowers filed his July 8, 2004 notice of appeal.[13]
On July 16, 2004, USAA filed a reply memorandum to Flowers's memorandum in opposition to USAA's motion for attorney's fees and costs. USAA agreed that at the time USAA filed its motion for attorney's fees and costs, the circuit court had not yet entered a final judgment pursuant to Jenkins v. Cades Schutte Fleming & Wright, 76 Hawai`i 115, 864 P.2d 1334 (1993).
On August 25, 2004, the circuit court filed its order granting USAA's motion for attorney's fees and costs. On September 8, 2004, Flowers appealed this order.
The Hawai`i Supreme Court dismissed as premature Flowers's appeals because the order granting motion for summary judgment, filed on April 12, 2004, had not yet been reduced to a separate judgment, pursuant to Hawai`i Rules of Civil Procedure (HRCP) Rule 58 and Jenkins.
On December 21, 2004, the circuit court entered a judgment in favor of USAA and against Flowers for the amount of $7,444.23.
On January 12, 2005, Flowers filed two notices of appeal. The appeals (Nos. 27057 and 27128) were consolidated for briefing and disposition under No. 27057. However, the Hawai`i Supreme Court determined that the December 21, 2004 judgment did not comply with HRCP Rule 58 and Jenkins and was therefore not a final judgment for appeal purposes. Rather than again dismissing the appeals as premature, the supreme court exercised its supervisory power over the circuit court pursuant to Hawaii Revised Statutes (HRS) § 602-4 (1993)[14] and on March 24, 2005, entered an order of temporary remand for entry of a judgment that complied with Jenkins.
On temporary remand, the circuit court entered a final judgment on March 30, 2005 in favor of USAA and against Flowers as to all claims asserted by the parties. On April 12, 2005, Flowers filed a notice of appeal, which appeal was designated as appeal No. 27229. On April 19, 2005, the supreme court consolidated appeal No. 27229 with appeal No. 27057 for briefing and disposition.

II. DISCUSSION
A. The Propriety of the Order Granting USAA's Motion for Summary Judgment
In summary judgment proceedings,
[t]he burden is on the party moving for summary judgment (moving party) to show the absence of any genuine issue as to all material facts, which, under applicable principles of substantive law, entitles the moving party to judgment as a matter of law. This burden has two components.
First, the moving party has the burden of producing support for its claim that: (1) no genuine issue of material fact exists with respect to the essential elements of the claim or defense which the motion seeks to establish or which the motion questions; and (2) based on the undisputed facts, it is entitled to summary judgment as a matter of law. Only when the moving party satisfies its initial burden of production does the burden shift to the non-moving party to respond to the motion for summary judgment and demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial.
Second, the moving party bears the ultimate burden of persuasion. This burden always remains with the moving party and requires the moving party to convince the court that no genuine issue of material fact exists and that the moving part [sic] is entitled to summary judgment as a matter of law.
French v. Hawaii Pizza Hut, Inc., 105 Hawai`i 462, 470, 99 P.3d 1046, 1054 (2004) (quoting GECC Fin. Corp. v. Jaffarian, 79 Hawai`i 516, 521, 904 P.2d 530, 535, aff'd in part, 80 Hawai`i 118, 905 P.2d 624 (1995)).
"The evidentiary standard required of a moving party in meeting its burden on a summary judgment motion depends on whether the moving party will have the burden of proof on the issue at trial." GECC Fin. Corp., 79 Hawai`i at 521, 904 P.2d at 535.
When the party defending the action moves for summary judgment, it "may, at any time, move with or without supporting affidavits for a summary judgment in his [or her] favor as to all or any part" of the action. Hawai`i Rules of Civil Procedure Rule 56(b). Supporting affidavits are not required because the defending party does not have the burden of proof at trial and he or she can satisfy his or her burden on summary judgment "`by demonstrating that if the case went to trial there would be no competent evidence to support a judgment for his [or her] opponent.' For `[i]f no evidence could be mustered to sustain the non-moving party's position, a trial would be useless. . . .
McLellan v. Atchison Ins. Agency, Inc., 81 Hawai`i 62, 66, 912 P.2d 559, 563 (App. 1996) (quoting First Hawaiian Bank v. Weeks, 70 Haw. 392, 396-97, 772 P.2d 1187, 1190 (1989)). On appeal,
[w]e review the circuit court's grant or denial of summary judgment de novo. Hawai'i Cmty. Fed. Credit Union v. Keka, 94 Hawai`i 213, 221, 11 P.3d 1, 9 (2000). The standard for granting a motion for summary judgment is settled:
Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

Id. (citations and internal quotation marks omitted).
Zane v. Liberty Mut. Fire Ins. Co., 115 Hawai`i 60, 72-73, 165 P.3d 961, 973-74 (2007) (quoting Ouerubin v. Thronas, 107 Hawai`i 48, 56, 109 P.3d 689, 697 (2005)) (brackets omitted)).
Although the breach of contract and bad faith counts overlap somewhat in the instant case, the two claims are distinct and must be analyzed as such:
[T]here is a legal duty, implied in a first- and third-party insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action. The breach of the express covenant to pay claims, however, is not the sine qua non for an action for breach of the implied covenant of good faith and fair dealing. The implied covenant is breached, whether the carrier pays the claim or not, when its conduct damages the very protection or security which the insured sought to gain by buying insurance.
. . . .
[T]he appropriate test to determine bad faith is the general standards set forth in Gruenberg [v. Aetna Ins. Co., 9 Cal. 3d 566, 108 Cal. Rptr. 480, 510 P.2d 1032 (1973)] and its progeny. Under the Gruenberg test, the insured [sic] need not show a conscious awareness of wrongdoing or unjustifiable conduct, nor an evil motive or intent to harm the insured. An unreasonable delay in payment of benefits will warrant recovery for compensatory damages under the Gruenberg test. However, conduct based on an interpretation of the insurance contract that is reasonable does not constitute bad faith. In addition, an erroneous decision not to pay a claim for benefits due under a policy does not by itself justify an award of compensatory damages. Rather, the decision not to pay a claim must be in "bad faith."
Best Place, Inc. v. Penn America Ins. Co., 82 Hawai`i 120, 132-33, 920 P.2d 334, 346-47 (1996) (citations and internal quotation marks omitted).
Hence, we address first whether there is a question of fact as to whether USAA breached its Policy 1 and Policy 2 contracts with Flowers and second, whether there is a question of fact as to whether USAA engaged in bad faith in settling Flowers's claims.
1. The Breach of Contract Claims
In moving for summary judgment, USAA argued, as to Flowers's breach-of-contract claims, that Flowers simply cannot show that USAA breached any contractual provision of Policy 1 or Policy 2 because: (1) USAA was not contractually required to pay Flowers the replacement cost for his allegedly lost or stolen items since Flowers did not submit any proof that he had in fact replaced the items, which was a contractual requirement to recover full replacement cost under the policies; and (2) notwithstanding that USAA had no such contractual obligation, it in fact paid Flowers the depreciation amounts which it had initially withheld and thereby paid Flowers the full replacement cost of the allegedly missing or stolen items.
Because an insurance policy is a contract,
insurance policies are subject to the general rules of contract construction; the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended. Moreover, every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy.
Nevertheless, adherence to the plain language and literal meaning of insurance contract provisions is not without limitation. We have acknowledged that because insurance policies are contracts of adhesion and are' premised on standard forms prepared by the insurer's attorneys, we have long subscribed to the principle that they must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer. Put another way, the rule is that policies are to be construed in accord with the reasonable expectations of a layperson.
Dairy Rd. Partners v. Island Ins. Co., 92 Hawai`i 398, 411-12, 992 P.2d 93, 106-07 (2000) (citations, brackets, ellipses, and internal quotation marks omitted).
At issue in this case was the valuation method for calculating Flowers's alleged losses underlying Claims 1 and 2. USAA initially took the position that under Policies 1 and 2, Flowers was entitled to only the actual cash value of the allegedly missing or stolen items, defined in both policies as "the replacement cost of the property at the time of loss less a deduction for depreciation based on its age and usage." Indeed, USAA informed Flowers multiple times that if he wished to recover the held-back depreciation amount, he had to submit original receipts or other proof that he had actually replaced the allegedly missing or stolen items. Flowers, on the other hand, insisted that he was entitled to the full replacement cost of such items, without any deduction for depreciation.
Regarding the replacement-cost method for valuing property losses, one commentator has observed:
Replacement cost coverage was devised to remedy the shortfall in coverage which results under a property insurance policy compensating the insured for actual cash value alone. That is, while a standard policy compensating an insured for the actual cash value of damaged or destroyed property makes the insured responsible for bearing the cash difference necessary to replace old property with new property, replacement cost insurance allows recovery for the actual value of property at the time of loss, without deduction for deterioration, obsolescence, and similar depreciation of the property's value.
Typically, replacement cost provisions in insurance policies are of three types, and all three types may appear in the same policy. The first type of provision focuses on the amount of recovery, and often restricts the insured's recovery of replacement costs to the smallest of several' amounts. For example, a valuation provision may restrict an insured to the lesser of (1) the cost to replace the property with equivalent property, (2) the amount actually spent for replacement property, or (3) the policy liability limit applicable to the property. A second type of provision states that the insurer will not pay more than actual cash value for the damaged property until the repair or replacement is completed, and may provide that the replacement or repairs must be completed within a certain time frame. A third type of provision allows the insured to elect to collect the actual cash value of the damaged or destroyed property, disregarding the replacement cost provisions, without prejudicing his or her right to later claim additional payment on a replacement cost basis. Usually the third type of provision limits the time in which a replacement cost claim can be made to 180 days.
Annotation, Construction and Effect of Property Insurance Provision Permitting Recovery of Replacement Cost of Property, 1 A.L.R.5th 817, 827-28 (1992) (footnotes omitted). Professor Stempel, in his treatise on insurance contracts, explains:
Replacement cost tends to bring the highest indemnity figure no matter what the circumstances. If the market is high, this drives replacement cost up. If the cost less depreciation of the property is low, replacement cost will exceed that figure. Unless the broad evidence rule[[15]] gives unrealistic weight to sentimental factors, it is hard to imagine how any mix of eclectic factors could add up to property value in excess of what a brand new version of the property would cost.
Because replacement value tends to lead to the largest payments to policyholders, insurers are united in stressing that ACV does not mean replacement cost. The insurer's position is buttressed by the common property insurer practice of offering a "replacement cost" endorsement that the policyholder can purchase for (usually a small amount of) additional premium. Unless insurers are doing this all as a smokescreen, the common use of such riders to basic policies suggests that the insurer in writing basic coverage expects to pay something less than replacement value in the event of insured loss.
Jeffrey W. Stempel, 1 Stempel on Insurance Contracts § 8.02 at 8-9 to 8-10 (3d ed. 2008) (original footnotes omitted; footnote added).
a. Policy 1
In this case, Policy 1 plainly stated: "We will pay. the full cost of repair or replacement, subject to all policy provisions. No deduction will be made for depreciation." Additionally, Policy 1 stated:
1. It is our option to:
a. replace, or pay you our cost to replace the property with new property of like kind and quality, without deduction for depreciation, or
b. pay you the cost to repair or restore the property to the condition it was in just before the loss.[[16]]
. . . .
4. When the cost to repair or replace an item is more than $500, no more than actual cash value will be paid until repair or replacement is completed. You may make a claim for loss on an actual cash value basis and then make claim within 180 days after the loss for any additional liability.
(Footnote added.) Policy 1 thus plainly and unambiguously required USAA to pay the full replacement cost of items costing less than $500.00 to replace. For an item costing $500.00 or more to replace, however, Policy 1 provided that USAA would initially pay the actual cash value of the allegedly lost or stolen items (i.e., the replacement cost minus a deduction for the lost item's depreciation). Then, if the policyholder actually replaced the item and showed proof of such replacement, USAA would pay the "holdback amount"the amount withheld for depreciation of the allegedly lost or stolen item.
It appears to be undisputed that USAA eventually paid Flowers the full replacement cost of those missing items that Flowers assigned a value to and submitted documentation for under Policy 1, with no offset for depreciation, and that Flowers negotiated USAA's checks for these items. Therefore, as to these items, USAA clearly did not breach its contractual obligations to Flowers under Policy 1.
However, a dispute arose regarding USAA's failure to pay Flowers under Policy 1 for two items: a weight bench that Flowers admitted was damaged before being shipped from Hawai`i, and a DVD player that Flowers alleged was almost brand new when shipped but which was no longer being marketed when Flowers submitted a claim for its loss.
As to the weight bench, USAA refused to make payment to Flowers on grounds that Policy 1 did not provide coverage for damage to shipped goods. Flowers acknowledged that the weight bench was damaged[17] when it left Hawai`i, but he insisted that the weight bench was missing when the Flowerses' household goods arrived in Australia, entitling him to be paid the replacement cost of the bench. The record is unclear as to whether the weight bench arrived in Australia damaged or was missing. Flowers argues that there was a genuine issue of material fact regarding whether USAA breached its contractual obligations to him by determining that the weight bench was damaged and hence, not paying him its replacement cost. We agree.
Although Policy 1 indicates that USAA "will not cover loss or damage caused by . . . breakage, marring, . . . [or i]nherent defect in property" and USAA advised Flowers to submit claims for property damaged in transit to the "carrier and/or proper military claims office for consideration[,]" a claim for loss of an already damaged bench that was not delivered to its destination is different from a claim for damage caused by breakage, marring, or inherent defect. Under Policy 1, if the weight bench were missing or lost and cost $500.00 or less to replace, USAA was obligated to pay the cost of replacing the weight bench, with no deduction for depreciation.
Although the weight bench was apparently rusted, marred, and missing pieces prior to shipping, the record is unclear as to whether the bench was delivered. Thus, a genuine issue of material fact exists as to USAA's contractual liability for the replacement cost of the weight bench.
As to the DVD player, Policy 1 provided that when the cost to replace an item is more than $500.00, "no more than the actual cash value will be paid until repair or replacement was completed[.]" The record indicates that there was a dispute and confusion as to actual value and availability of the DVD player. Nevertheless, Flowers reported that the value of the DVD player was well over $500.00 and that a comparable DVD player would cost $1,049.00. Thus, under Policy 1, Flowers was entitled to receive no more than the actual cash value of the DVD player and was required to submit proof of replacement before the full replacement cost would be paid.
USAA did make a payment to Flowers for the DVD player and explained in a report attached to an April 18, 2002 letter that
[i]nitial paperwork submitted by Mr. Flowers, signed & dated 3/12/2000 lists Panasonic DVD without any model number. The claims settlement was based on a basic Panasonic DVD for the year 1997[.] As the DD 1840 lists a Pioneer DVD, based on research using USAA Claims Replacement Service we have determined the nearest "Like, Kind, Quality" replacement for DVD700 would be DVL1919 with a fully delivered price of $717.60. The amount originally allowed for the Panasonic has been deducted from the final settlement.
(Formatting altered.) Since Flowers admits that he did not submit any replacement receipts, as required by Policy 1, the record indicates that USAA did not breach any contractual duty in failing to pay Flowers the depreciation hold-back amount.
b. Policy 2
Policy 2 included the June 1999 endorsement, which amended item 4 of the loss-settlement section of Policy 1 to provide that USAA
will pay no more than actual cash value until repair or replacement of the damaged property is completed unless the entire loss is less than $500. You may make a claim for loss on an actual cash value basis. Repair or replacement must be completed within 365 days after loss unless you request in writing that this time limit be extended for an additional 180 days. Upon completion of repairs or replacement, we will pay the additional amount claimed under replacement cost coverage.
Under the foregoing endorsement to Policy 2, USAA was required to pay Flowers the actual cash value of only missing or stolen property "unless the entire loss is less than $500." Item 1 of the loss-settlement section was also amended to give USAA the following options:
a. replace or pay you our cost to replace the property with new property of like kind and quality, without deduction for depreciation, or
b. pay you the cost to repair or restore the property to the condition it was in just before the loss, or
c. pay you the necessary amount actually spent to repair or replace the damaged property.
(Emphasis added.) Thus, one of the options that USAA reserved for itself was to pay for the full replacement cost of missing or lost items.
For Claim 2, Flowers asserted that the replacement cost in United States dollars for the missing items he alleged were in his suitcase was $2,199.57. Although USAA paid Flowers $623.60 in settlement of Claim 2 for replacement of a passport and an airline ticket, USAA did not pay Flowers for the remaining items because he did not submit original receipts to prove ownership of those items.
Policy 2 provided moving and storage coverage, "for. . . . loss of . . . property if, when described under a bill of lading, mover's contract, baggage check, or other form of shipping or storage document, it cannot be located after a reasonable search." Unlike the items in Claim 1 covered by Policy 1, which were described in shipping documents, there is no indication in the record that the contents of Flowers's missing suitcase were described in any baggage check or shipping document. Moreover, the insured's-duties-after-loss section was the same for Policy 1 and Policy 2 and provided that "[i]f there is an accident or incident that may be covered by this policy, [Flowers] must . . . [s]end [USAA] receipts, appraisals or other proof of ownership or value." (Formatting altered.) Since the record indicates that Flowers was unable to submit proof of ownership of the items he claims were in his missing suitcase, he failed to comply with the duties imposed on him by Policy 2 to trigger USAA's contractual obligation to pay for these items. Flowers admitted that he did not replace the missing items and provide USAA with proof of replacement. Therefore, USAA did not breach its contractual duties to Flowers under Policy 2.
2. The Bad-Faith Claims
In Best Place, 82 Hawai`i at 133, 920 P.2d at 347, the Hawai`i Supreme Court held as follows with respect to bad-faith claims against an insurer:
[T]he insured need not show a conscious awareness of wrongdoing or unjustifiable conduct, nor an evil motive or intent to harm the insured. An unreasonable delay in payment of benefits will warrant recovery for compensatory damages[.] However, conduct based on an interpretation of the insurance contract that is reasonable does not constitute bad faith. In addition, an erroneous decision not to pay a claim for benefits due under a policy does not by itself justify an award of compensatory damages. Rather, the decision not to pay a claim must be in bad faith.
(Citations and internal quotation marks omitted; emphasis added.)
The record indicates that when Flowers submitted Claim 1 under Policy 1, USAA insisted that he was entitled only to the actual cash value of the missing household items, despite Flowers's adamant protests that he was entitled to replacement costs, without deduction for depreciation. For example, in a letter dated April 16, 2001, USAA informed Flowers that "when the total loss is more than $500, we pay no more than the actual cash value until replacement is completed. In no event will the policy pay more than the actual cost to replace the missing property." (Emphasis added.) USAA went on to say:
When the replacement is completed, please send us a copy of the receipts in the envelope provided as verification that the items were replaced. You only need to provide receipts for the items depreciated.
We will consider a supplemental claim for the depreciation withheld provided the replacement is completed within a reasonable amount of time after the loss.
Also, in a letter dated December 5, 2001, USAA told Flowers:
Date of loss July 21, 2000: The claim was concluded on April 16, 2001 when payment was issued for the items for which sufficient documentation had been received, less the deductible and recoverable holdback. As you have been advised in our letter dated April 16, 2001, you must submit a legible copy of the receipts documenting that the items have been replaced in order to recover the holdback amount. As you were also advised in the same letter, the final date to submit this information is December 24, 2002.
It was only after Flowers sought DCCA's intervention that USAA acknowledged its erroneous application of the June 1999 endorsement in correspondence to DCCA dated March 8, 2002. In this letter, USAA explained that when it was brought to its attention that the June 1999 endorsement was not attached to Flowers's policy, USAA issued Flowers a check on January 7, 2002 for the depreciation amount of $1,332.32. This correspondence went on to explain that "[i]tems where there was no cost provided by [Flowers], were not included in the settlement."
Flowers maintains that USAA disingenuously applied the June 1999 endorsement to Policy 1, and that "[t]his act demonstrates malicious conduct with reckless disregard for consequences and an attempt by insurer to camouflage its bad faith." In light of the record, there was a genuine issue of material fact as to whether USAA engaged in bad faith in applying the June 1999 endorsement to Policy 1.
Flowers also contends that USAA's adjusters deliberately instructed him to provide them with the original cost of missing items, "with knowledge that original cost [in some instances] occur [sic] less value than today's fair market value (replacement cost at today's price)." The record indicates that USAA applied the 1999 endorsement to Flowers's Claim 1 and did not pay Flowers the full replacement cost for Claim 1 items costing $500.00 or less to replace until after Flowers sought DCCA's intervention. USAA's delay in paying Flowers the full replacement cost for these Claim 1 items presents a material question of fact as to whether USAA engaged in bad faith with respect to Claim 1.
We earlier held that there is a genuine issue of material fact regarding whether USAA breached Policy 1 in denying Flowers's claim for his allegedly missing weight bench. There is also a genuine issue of material fact regarding whether USAA did so in bad faith.
Since there was no breach of contract under Policy 2 for Claim 2, Flowers's bad-faith claims are limited to Claim 1. See Ass'n of Apartment Owners v. Union Pac. Ins. Co., 77 Hawai`i 358, 361, 884 P.2d 1134, 1137 (1994) (adopting the holdings of other courts that "an insurer cannot recover for the tort of a bad faith failure to investigate and pay losses incurred by the insured where the insured did not prevail on its claim that the insurers were liable on the underlying policies" and "[a]lthough styled a tort, an action for bad-faith breach of contract is created by contract and requires proof of a breach of contract").
B. The Order Allowing Flowers's Attorney's Motion to Withdraw
Flowers argues that the circuit court erred by allowing Flowers's attorney to withdraw as counsel. In light of our disposition of this appeal as to the summary judgment issue, we find it unnecessary to address this issue.
C. The Order Requiring Documents Produced for Discovery to be Delivered to Rosenberg for Copying
In response to Flowers's motion to compel USAA to produce documents for inspection and copying, the circuit court entered an order granting the motion but also directing the parties to deliver documents produced for discovery in the future to Rosenberg's office for copying, "with the party making the request for production to be responsible for copying costs." Flowers contends that the circuit court abused its discretion in requiring the parties to produce documents to Rosenberg because "Rosenberg required $30-35.00 for labor that excluded cost of copies" and "this effort required duplication of cost for documents already inspected and copied."
Our review of the transcripts of the hearing on Flowers's motion to compel production of documents reveals that the circuit court's order was prompted by the contentiousness and mistrust that had arisen between the parties. Moreover, although Flowers initially objected to turning over documents to Rosenberg, upon the circuit court's further explanation of the process, Flowers responded, "I have no problems with that." Therefore, Flowers waived this argument for appeal purposes.
D. Motion to Strike Exhibits
Flowers contends that the circuit court erred in denying his motion to strike exhibits.
Hawaii Rules of Evidence (HRE) Rule 401 provides:
Definition of "relevant evidence". "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
HRE Rule 404 provides, in relevant part:
Character evidence not admissible to prove conduct; exceptions; other crimes. (a) Character evidence generally. Evidence of a person's character or a trait of a person's character is not admissible for the purpose of proving action in conformity therewith on a particular occasion[.]
However, HRE Rule 608(a) provides, in relevant part:
Evidence of character and conduct of witness. (a) Opinion and Reputation Evidence of Character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations:
(1) The evidence may refer only to character for truthfulness or untruthfulness[.]
USAA's Exhibits "E" and "F" were copies of pleadings from prior cases which indicated that Flowers had been accused of committing federal offenses of larceny. "Common-law larceny has been broadened by some states to include embezzlement and false pretenses, all three of which are often subsumed under the statutory crime of `theft.'" Black's Law Dictionary 896 (8th ed. 2004). These documents were not relevant because "a theft offense is not, per se, a `crime of dishonesty' such that it is admissible to impeach a [witness's] credibility." State v. Pacheco, 96 Hawai`i 83, 100, 26 P.3d 572, 589 (2001). However, these documents were attached as exhibits to a memorandum in opposition to Flowers's motion to file a second amended complaint, which the circuit court granted. Therefore, to the extent that the circuit court's ruling rested on its determination that Exhibits "E" and "F" related to Flowers's credibility, such error was harmless.
E. Motions for Reconsideration and to Alter or Amend the Judgment
Flowers argues that the circuit court erred by denying his motions for reconsideration and to alter or amend the judgment because he presented new information therein that he could not have presented during adjudication of this case. In light of our disposition of this appeal, it is unnecessary for us to address this argument.
F. Attorney's Fees and Costs
Finally, Flowers asserts that the circuit court erred by awarding USAA attorney's fees because the court was without jurisdiction to do so after Flowers filed his notice of appeal on July 8, 2004. In light of our disposition of this appeal, we vacate the circuit court's order awarding USAA attorney's fees.

IV. CONCLUSION
For the foregoing reasons, we conclude that issues of material fact exist regarding whether USAA breached Policy 1 with respect to Flowers's claim for replacement cost of the weight bench, whether USAA's denial of payment for the weight bench was in bad faith, and whether USAA's delay in paying replacement costs for other Claim 1 items was in bad faith. Accordingly, we vacate: (1) the March 30, 2005 judgment of the Circuit Court of the First Circuit; (2) the Order Granting USAA's Motion for Summary Judgment, filed on April 12, 2004; and (3) the Order Granting USAA's Motion for Attorney's Fees and Costs, filed on August 25, 2004. We remand for further proceedings consistent with this opinion.
NOTES
[1] The Honorable Victoria S. Marks presided.
[2] Flowers initially filed his complaint against USAA on July 16, 2002. He subsequently filed a first amended complaint on October 2, 2002 and a second amended complaint on January 2, 2004. Although the circuit court entered the March 30, 2005 judgment in favor of USAA and against Flowers "on all claims asserted in Flowers's Complaint," we have assumed, for purposes of this opinion that the complaint referred to in the judgment is Flowers's second amended complaint.
[3] The record indicates that Flowers also sought assistance from the California Insurance Commissioner and the Texas Insurance Commission to effectuate a settlement with USAA.
[4] In an answer to an interrogatory dated September 29, 2003, USAA referenced this teleconference as an example of Flowers's failure to cooperate with USAA, stating: "[In [a] July 3, 2002 letter [Flowers] agreed to accept an amount in settlement for his moving and storage claim. USAA agreed but [Flowers] then rejected the offer in a July 9, 2002 conference."
[5] This check was issued to settle Claim 2. According to a letter from USAA dated April 18, 2002, the check was for $623.60, not $623.00, as asserted by Flowers in his October 30, 2002 letter.
[6] The $252.96 check was apparently for taxes.
[7] By our calculations, the sum of $4,062.90, $1,332.32, and $252.96 is actually $5,648.18.
[8] In its motion for summary judgment, USAA alleged that in the instant action, Flowers initially sought double recovery of these savings bonds, but later moved to amend his first amended complaint, abandoning his claim for the $21,000.00 bond amount. USAA elaborates in a footnote:

FLOWERS abandoned this claim with the apparent intent to avoid an affirmative defense of fraud, a defense which finds support based on FLOWERS['S] attempt to simultaneously effect recovery for the purportedly lost bonds in one federal forum and two state court case [sic] (including this one), all three actions which were not initiated until after the U.S. Treasury had already paid the full amount of the replaced bonds. In dismissing FLOWERS'[S] case which sought recovery for the bonds in Civil No. 03-00016, U.S. District Court Judge Susan Oki Mollway noted that in a state court action which FLOWERS filed against his own daughters whereby FLOWERS sought a declaration that he was the rightful owner of the bonds and sought an order directing the U.S. government to reimburse him for the amounts, FLOWERS 1) failed to inform the state court that the U.S. Treasury had already reimbursed the loss for the bonds, and 2) FLOWERS failed to name the U.S. government to the action. FLOWERS had been granted a default judgment in the First Circuit Court of Hawaii forum, because the daughters that he sued live in Florida and never appeared to defend that suit. Mollway noted that coupled with FLOWERS'S omissions in this suit, the default judgment might facilitate an attempt by Flowers and his daughters to defraud the government by seeking double recovery for the bonds.
[9] In his submissions to this court and the circuit court, Flowers made repeated accusations of a conspiracy between USAA and the United States government. For example, in his opening brief, Flowers contends that the

[i]ssues relevant to this case extend far beyond lower court errors but blatant discrimination and conspiracy by USAA with other parties from the federal civil litigation [(as referenced in Exhibits E and F, which Flowers argues on appeal that the circuit court erred by failing to strike)] to have this case dismissed on mere technicalities; A conspiracy that . . . would entangle [Flowers] in the big legal web and be consumed by the spider of injustice[.]
In his reply brief, Flowers stated that an army official had "secretly orchestrated removal of the suitcase that included saving bonds and then coordinated expeditious redemption of the bonds (if redeemed) to conceal the seizure." The record on appeal includes a letter dated June 17, 2001, in which Flowers contended that named USAA employees "are fully aware as to what happened to luggage missing on a military flight from Hickam Air Force Base [to North Island] Naval Station, San Diego, California." In letters to USAA dated September 7, 2002 and October 30, 2002, Flowers alleged that "member(s) from [USAA's] office were instrumental in relocating [his] luggage from the terminal at San Diego, California[,]" and "[u]nknown individuals are instrumental in preventing and safe guarding [sic] information regarding the removal of baggage form [sic] the North Island Naval Station, San Diego."
[10] The items for which Flowers submitted claims as part of Claim 2 included the following: United States savings bonds, Delta airline vouchers, a green Samsonite suitcase, a United States passport, seven men's dress trousers, one long-sleeved dress shirt, two neckties, Casio portable television, four pairs of socks, a cassette recorder, an ATT phone card, a pair of prescription eyeglasses, a 35 mm camera, a Nokia lithium battery, a Nokia car battery charger, a Nokia hands-free car phone, a Panasonic telephone, a Walkman head radio, pullover shirts, undergarments, toiletry items, and black shoes.
[11] Presumably, Flowers was referring to Hawaii Rules of Evidence Rule 404, entitled "Character evidence not admissible to prove conduct; exceptions; other crimes."
[12] In an affidavit attached to his memorandum in opposition to the motion for summary judgment, Flowers admitted that in the itemized statement of loss he had submitted to USAA, he had noted the original price, not the replacement price, of lost items which were the basis of Claim 2.
[13] Flowers cites to Hawai`i Rules of Appellate Procedure Rule 4 as support for this argument; however, the language he quotes, purportedly from this rule, is inaccurate.
[14] HRS § 602-4 (1993), provides:

Superintendence of inferior courts. The supreme court shall have the general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses therein where no other remedy is expressly provided by law.
[15] According to Professor Stempel, four approaches are typically used to assess the monetary value of tangible property: market value ("what the property would bring in an arm's-length sale between a willing buyer and a willing seller at the time of the loss"); replacement cost less depreciation ("the cost to rebuild the property less the reduction in the value of the property caused by depreciation"); full replacement cost ("the amount it would require to replicate the lost property, with no depreciation taken from the replacement price[, which is e]ssentially . . . a formula based on modern construction (or reconstruction) costs"); and the broad evidence test, which is "valuation based on the court's sifting of any relevant evidence tending to establish actual cash value." Jeffrey W. Stempel, 1 Stempel on Insurance Contracts § 8.02 at 8-8 (3d ed. 2008).
[16] This option appears to be applicable to damaged items, not items that were missing or lost while being moved or stored, and which were subject to the moving-and-storage provisions of the policy.
[17] The record contains an itemized list from American Movers, Inc., signed and dated by Flowers, pertaining to the August 31, 1999 shipment of the Flowerses' household goods. The weight bench is included in this list with a' notation "M" on the line next to it. A legend on the same page labeled "Exception Symbols" indicates that "M" means "marred."